GEATHERS, J.:
**84 Appellant Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Medical Center-Fort Mill (Carolinas), challenges a decision of the South Carolina Administrative Law Court (ALC) ordering Respondent South Carolina Department of Health and Environmental Control (DHEC) to issue a Certificate of Need (CON) to Respondent Amisub of South Carolina, Inc., d/b/a Piedmont Medical Center, d/b/a Fort Mill Medical Center (Piedmont). Carolinas argues the purpose and effect of the ALC's application of the CON Act, the Project Review Criteria, and the 2004-2005 State Health Plan is to protect Piedmont from out-of-state competition, and, therefore, such an application violates the Dormant Commerce Clause.[1] We affirm.
**85 FACTS/PROCEDURAL HISTORY
Piedmont Medical Center in Rock Hill is the sole hospital in York County. It provides standard community hospital services as well as specialized services such as open heart surgery, neurosurgery, neonatal intensive care, and behavioral health. Amisub of South Carolina, Inc., which is a subsidiary of Tenet Healthcare Corporation, operates Piedmont Medical Center. Tenet Healthcare Corporation is headquartered in Dallas, Texas, and owns forty-nine hospitals in ten states.
Carolinas, which is headquartered in Charlotte, North Carolina, owns multiple hospitals in North Carolina with a large network of employed physicians, the Carolinas Physician Network (CPN), many of whom have practices in York County. As of the date of the final contested case hearing, Carolinas employed between seventy and ninety York County physicians. Additionally, Carolinas owns and operates Roper Hospital in downtown Charleston.
In 2005, Piedmont, Carolinas, Presbyterian Healthcare System (Presbyterian), and Hospital *636 Partners of America, Inc. submitted applications to DHEC for a CON to build a sixty-four-bed hospital near Fort Mill based on the 2004-2005 State Health Plan's identification of a need for sixty-four additional acute care hospital beds in York County. Subsequently, Piedmont withdrew its application and submitted a new application for a one-hundred-bed hospital, which would include thirty-six beds transferred from Piedmont's Rock Hill facility to its proposed Fort Mill facility. In 2006, DHEC approved Piedmont's new application and denied the other three applications. Carolinas and Presbyterian filed separate requests for a contested case hearing before the ALC, which took place in September 2009.
The ALC concluded DHEC misinterpreted the 2004-2005 State Health Plan to allow only existing providers to obtain a CON. The ALC remanded the case to DHEC for a determination of which applicant most fully complied with the CON Act, the State Health Plan, Project Review Criteria,[2] and applicable **86 DHEC regulations. By October 2010,[3] the three remaining applicants submitted to DHEC additional information to supplement their respective applications.
In September 2011, DHEC granted Carolinas' application and denied the applications of Piedmont and Presbyterian. Piedmont and Presbyterian submitted their respective requests for a contested case hearing before the ALC, and the ALC consolidated the cases. Presbyterian later withdrew its request, and the ALC dismissed Presbyterian as a party. The ALC ultimately ordered DHEC to award the CON to Piedmont. Carolinas filed a motion for reconsideration pursuant to Rule 59(e), SCRCP, and the ALC issued an Amended Final Order denying the motion. This appeal followed.
STANDARD OF REVIEW
The Administrative Procedures Act governs the standard of review on appeal from a decision of the ALC, allowing this court to
reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) affected by other error of law; (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
S.C. Code Ann. § 1-23-380(5) (Supp. 2017).
LAW/ANALYSIS
Carolinas does not challenge the constitutionality of the CON Act itself. Further, Carolinas does not challenge the **87 constitutionality of the 2004-2005 State Health Plan or the Project Review Criteria. Rather, Carolinas argues the purpose and effect of the ALC's application of the CON Act, the *637 2004-2005 State Health Plan, and the Project Review Criteria is to protect Piedmont from out-of-state competition, and, therefore, such an application violates the Dormant Commerce Clause. Carolinas essentially challenges the ALC's conclusions of law concerning adverse impact and outmigration.
On this record,[4] we hold the ALC properly applied the provisions of the CON Act, the 2004-2005 State Health Plan, and the Project Review Criteria in considering the needs of residents in all areas of York County and, therefore, did not violate the Dormant Commerce Clause. The ALC placed appropriate significance on adverse impact, as required by the Project Review Criteria, and outmigration, as we explain herein.
We will address each criterion Carolinas references in turn. But first, we will provide a primer on the general principles surrounding the Dormant Commerce Clause and the general provisions of South Carolina's CON law.
Dormant Commerce Clause
The Commerce Clause of the United States Constitution grants Congress the power to regulate commerce among the several states. U.S. Const. art. I, § 8, cl. 3. "The [United States Supreme] Court has consistently explained that the Commerce Clause was designed to prevent States from engaging **88 in economic discrimination so they would not divide into isolated, separable units." South Dakota v. Wayfair, Inc. , --- U.S. ----, 138 S.Ct. 2080, 2093-94, 201 L.Ed.2d 403 (2018). "Although the Commerce Clause is written as an affirmative grant of authority to Congress, [the United States Supreme] Court has long held that in some instances it imposes limitations on the States absent congressional action." Id . at 2089.
The Court's "[D]ormant Commerce Clause jurisprudence 'significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce.' " McBurney v. Young , 569 U.S. 221, 235, 133 S.Ct. 1709, 185 L.Ed.2d 758 (2013) (quoting Maine v. Taylor , 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) ). "It is driven by a concern about 'economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " Id. (quoting New Energy Co. of Ind. v. Limbach , 486 U.S. 269, 273-74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) ). "The 'common thread' among those cases in which the [United States Supreme] Court has found a [D]ormant Commerce Clause violation is that 'the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation.' " Id. (quoting Hughes v. Alexandria Scrap Corp. , 426 U.S. 794, 806, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) ).
In other words, two primary principles mark the boundaries of a State's authority to regulate interstate commerce. "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." Wayfair , 138 S.Ct. at 2091. When a state law discriminates on its face or has a discriminatory effect or purpose, the law must be "demonstrably justified by a valid factor unrelated to economic protectionism," and there must be an absence of "nondiscriminatory alternatives adequate to preserve the local interests at stake." Envtl. Tech. Council v. Sierra Club , 98 F.3d 774, 785 (4th Cir. 1996) (quoting New Energy , 486 U.S. at 274, 108 S.Ct. 1803 and Chem. Waste Mgmt., Inc. v. Hunt , 504 U.S. 334, 342, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) ). On the other hand, "[s]tate laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest ... will be upheld unless the burden imposed on such commerce is clearly excessive in **89 relation to the putative local benefits.' " Wayfair, 138 S.Ct. at 2091 (second alteration in original) (quoting Pike v. Bruce Church, Inc. , 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) ). "Although subject to exceptions and variations, these two principles guide the courts in adjudicating cases challenging state laws under the Commerce Clause." Id. (citations omitted). *638 Here, Carolinas argues that the ALC's application of South Carolina's CON law to the present case discriminates against interstate commerce in its purpose and effect. "[A] state or local law discriminates by restricting market participation or curtailing the movement of articles of interstate commerce based on whether a market participant or article of commerce is in-state versus out-of-state, or local versus non-local." Florida Transp. Servs., Inc. v. Miami-Dade Cty. , 703 F.3d 1230, 1244 (11th Cir. 2012). "In conducting the discrimination inquiry, a court should focus on discrimination against interstate commerce -not merely discrimination against the specific parties before it." Colon Health Ctrs. of Am., LLC v. Hazel (Hazel I) , 733 F.3d 535, 543 (4th Cir. 2013).
Focusing exclusively on discrimination against individual firms ... improperly narrows the scope of the judicial inquiry and has the baneful effect of precluding certain meritorious claims. For while the burden on a single firm may have but a negligible impact on interstate commerce, the effect of the law as a whole and in the aggregate may be substantial.
Id. Further, in applying the discrimination test, "[c]ourts are afforded some latitude to determine for themselves the practical impact of a state law, but in doing so they must not cripple the States' 'authority under their general police powers to regulate matters of legitimate local concern.' " Colon Health Ctrs. of Am., LLC v. Hazel (Hazel II) , 813 F.3d 145, 152 (4th Cir. 2016) (quoting Taylor , 477 U.S. at 138, 106 S.Ct. 2440 ). Moreover, "[t]he burden to show discrimination rests on the party challenging the validity of the statute, but '[w]hen discrimination against commerce ... is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local **90 interests at stake.' " Hughes v. Oklahoma , 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (second alteration in original) (quoting Hunt v. Washington Apple Advertising Comm'n , 432 U.S. 333, 353, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ). In order to prove discriminatory effect, the party asserting a Dormant Commerce Clause violation must show that the state law, "if enforced, would negatively impact interstate commerce to a greater degree than intrastate commerce." Hazel II , 813 F.3d at 153 (quoting Hazel I , 733 F.3d at 543 ).
Nonetheless, the Commerce Clause
does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to "place itself in a position of economic isolation," it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.
Taylor , 477 U.S. at 151, 106 S.Ct. 2440 (emphasis added) (citation omitted) (quoting Baldwin v. G.A.F. Seelig, Inc. , 294 U.S. 511, 527, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) ). "The Supreme Court has consistently held that a state's power to regulate commerce is at its zenith in areas traditionally of local concern." Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson , 48 F.3d 391, 398 (9th Cir. 1995) (citing Hunt , 432 U.S. at 350, 97 S.Ct. 2434 ). "In addition, regulations that touch on safety are those that the Court has been most reluctant to invalidate." Id. (citing Raymond Motor Transp., Inc. v. Rice , 434 U.S. 429, 443, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) ). While "a bald assertion that laws are directed toward legitimate health and safety concerns is not enough to withstand a [D]ormant Commerce Clause challenge, ... [courts] must give some deference to states' decisions regarding health and safety." Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown , 567 F.3d 521, 526 (9th Cir. 2009) (citing Gen. Motors Corp. v. Tracy , 519 U.S. 278, 307, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) ).
South Carolina CON Law
The purpose of the CON Act is to "promote cost containment, prevent unnecessary duplication of health care facilities and services, guide the establishment of health facilities and **91 services [that] will best serve public needs, and ensure that high quality services are provided in health facilities in this [s]tate." S.C. Code Ann. § 44-7-120 (2002). To *639 achieve these purposes, the CON Act requires (1) the issuance of a CON before undertaking a project prescribed by the CON Act, (2) the adoption of procedures and criteria for submitting a CON application and for review before issuing a CON, (3) the preparation and publication of a State Health Plan, and (4) the licensing of health care facilities. Id. DHEC is designated the sole state agency for control and administration of the CON program and licensing of health facilities. S.C. Code Ann. § 44-7-140 (2002). A person or health care facility must obtain a CON before, among other things, establishing a new health care facility or changing the existing bed complement of a health care facility. S.C. Code Ann. § 44-7-160 (2002) (amended 2010).
With the advice of a health planning committee, of which most of the members are appointed by the Governor, DHEC must prepare a State Health Plan for use in administering the CON program. S.C. Code Ann. § 44-7-180(A), (B) (2002) (amended 2010). The State Health Plan has designated four regions of the state for the purpose of keeping an inventory of health facilities and services. Chapter II.A, 2004-2005 State Health Plan. Each region is further divided into service areas. Id. In the 2004-2005 State Health Plan, most service areas consist of individual counties, as is the case with York County.
DHEC may not issue a CON unless an application complies with the State Health Plan, Project Review Criteria, and other regulations. S.C. Code Ann. § 44-7-210(C) (2002) (amended 2010); see also S.C. Code Ann. Regs. 61-15 § 801.3 (2011) (amended 2012) ("[N]o project may be approved unless it is consistent with the State Health Plan."); S.C. Code Ann. Regs. 61-15 § 802.1 (2011) (amended 2012) ("The proposal shall not be approved unless it is in compliance with the State Health Plan."). Further, there are thirty-three criteria for DHEC's review of a project. S.C. Code Ann. Regs. 61-15 § 802 (2011) (amended 2012). The criteria are grouped under the following categories:
Need for the Proposed Project (Section 802.1 through 802.4)
Economic Consideration (Section 802.5 through 802.19)
**92 Health System Resources (Section 802.20 through 802.25)
Site Suitability (Section 802.26 through 802.30)
Special Consideration (Section 802.31 through 802.33)
S.C. Code Ann. Regs. 61-15 § 801.1 (2011). Each section of Chapter II of the State Health Plan designates the most important project review criteria for the particular type of facility or service addressed in that section. Chapter I.I, 2004-2005 State Health Plan. "The relative importance assigned to each specific criterion is established by [DHEC] depending upon the importance of the criterion applied to the specific project." § 801.2 (2011). Further, "[t]he relative importance must be consistent for competing projects." Id.
When DHEC is considering competing applications, it must award a CON on the basis of which applicant most fully complies with the CON Act, the State Health Plan, Project Review Criteria, and applicable DHEC regulations. S.C. Code Ann. § 44-7-210(C) (2002) (amended 2010). However, if neither application complies with these requirements, DHEC may not issue a CON. Id. Further, DHEC may refuse to issue a CON based on identified project review criteria and other regulations even if an application complies with the State Health Plan. Id.
In the present case, DHEC established the relative importance of the Project Review Criteria for the competing CON applications, "listing the most important criteria first, as follows:
*640 **93 ?
The ALC's Application of Project Review Criteria
1. Adverse Impact
Carolinas first challenges the ALC's application of criteria 16(c), 22, and 23(a).[5] With regard to these criteria, Carolinas argues the ALC's adverse impact analysis was one-sided and, thus, discriminatory. In other words, the ALC assessed whether awarding a CON to Carolinas would have an adverse impact on Piedmont without assessing whether awarding the CON to Piedmont would have an adverse impact on Carolinas. Carolinas maintains the purpose underlying the ALC's analysis was to protect Piedmont from non-local competition and to reduce the number of South Carolinians seeking healthcare in North Carolina.
a. Criterion 16(c)
Criterion 16 is entitled "Cost Containment (Minimizing Costs)" and is grouped under the general category "Economic Consideration." §§ 801.1, 802.16. Criterion 16(c) states, "The impact of the project upon the applicant's cost to provide services and the applicant's patient charges should be reasonable.
**94 The impact of the project upon the cost and charges of other providers of similar services should be considered if the data are available." § 802.16 (emphasis added). Carolinas asserts (1) the ALC incorrectly included Criterion 16(c) in its adverse impact analysis and (2) the intent and effect of the ALC's application of this criterion was "to protect the local hospital's profitability from being harmed by a new market entrant."
In its conclusions of law regarding adverse impact, the ALC stated, "The most heavily disputed application of the Project Review Criteria relates to DHEC's analysis of the Project Review Criteria on adverse impact." The ALC identified Criterion 16(c) as being included in the adverse impact criteria, and explained its conclusion that Piedmont best met Criterion 16(c) as follows:
The effect on Piedmont of the loss of over one thousand (1000) patients and millions of dollars a year will make it more difficult for the hospital to recoup its fixed costs. Its associated per unit cost per unit of services associated would increase. As a result, the operation of [Carolinas' proposed facility] would have an adverse effect on existing providers.
Carolinas is correct in its observation that Criterion 16(c) is not grouped together with the criteria entitled "Adverse Effects on Other Facilities," which falls under the general category of "Health System Resources." See S.C. Code Ann. Regs. 61-15 §§ 801.1, 802.23. However, the ALC was obviously aware of this when it recounted DHEC's establishment of the relative importance of the Project Review Criteria, which includes "Cost Containment (16a-16c)" in the group of the third-most-important criteria and "Adverse Effects on Other Facilities (23a, 23b)" in the group of the fourth-most-important criteria. Yet, when presented with the task of choosing *641 "which applicant most fully complies with"[6] Criterion 16(c), the ALC focused on the second part of this criterion, which requires consideration of "the impact of the project upon the cost and charges of other providers of similar services." § 802.16. Here, the ALC determined Carolinas' proposed facility would have an adverse impact on the cost and charges of Piedmont's existing facility. Therefore, it was logical for the ALC to **95 include its application of Criterion 16(c) within its discussion of adverse impact generally. Further, the protection of existing providers' patients from increased costs is an obvious objective of Criterion 16(c), which Carolinas does not challenge.
b. Criterion 22
Criterion 22 states, "The existing distribution of the health service(s) should be identified and the effect of the proposed project upon that distribution should be carefully considered to functionally balance the distribution to the target population." § 802.22. This criterion falls under the general category of Health System Resources. §§ 801.1, 802.22. Carolinas maintains the ALC concluded Piedmont best met Criterion 22 "because increased competition from [Carolinas' proposed facility] would negatively impact Piedmont's ability to retain its staff physicians and receive their referrals." Carolinas argues the ALC applied Criterion 22 for the purpose of "protecting an existing local hospital from competition from a non-local hospital."
The ALC explained its conclusion that Piedmont best met Criterion 22 as follows:
[T]he operation of [Carolinas' proposed facility] would have an adverse effect on the distribution of services provided by existing healthcare providers to the residents of York County. Section 802.22 calls for an evaluation of the effect of the proposed facility or service not only on Piedmont but also on other healthcare providers. Letters from over forty (40) physicians to DHEC during its staff review as well as the testimony of ... three physicians is compelling evidence that the ability of existing York County healthcare providers to serve residents of the county would be jeopardized by the operation of [Carolinas' proposed facility].
Carolinas states that despite the ALC's reference to the adverse effects on physicians, the ALC's findings of fact "demonstrate that the ALC's primary concern was the extent to which changes in the physician market arising from the establishment of [Carolinas' proposed facility] would affect Piedmont."
First, an adverse effect on Piedmont's existing facility alone would be sufficient to warrant the conclusion that Piedmont, **96 rather than Carolinas, better meets Criterion 22 because of the specialized services the existing facility offers. In its findings of fact, the ALC stated, "In addition to standard community hospital services, Piedmont Medical Center provides specialized services not usually offered by a hospital its size, including open heart surgery, neurosurgery, cardiac catheterization, vascular surgery, neonatal intensive care, specialized women's and pediatric services, and behavioral health." Notably, Carolinas has not challenged any of the ALC's findings of fact as not being supported by substantial evidence.
Further, the ALC's findings discussing the adverse impact on Piedmont that would result from physicians shifting their patient referrals from Piedmont's existing facility to Carolinas also referenced the likely adverse impact on physicians themselves. The ALC highlighted the testimony of a cardiology physician concerning the effect of awarding the CON to Carolinas:
Dr. Singhi recognized the challenges that would exist if [Carolinas' proposed facility] was approved that would not permit his practice to maintain its present status (e.g.[,] being able to refer and admit patients to any facility [of ] his choosing at which he has privileges ).... If the Carolina Cardiology Physicians become employed by [Carolinas], Dr. Singhi acknowledged that [Carolinas] would expect his group to comply with the CPN physician network referral policy and transfer patients from Piedmont to [Carolinas'] facilities.
*642 (emphasis added). The ALC also discussed the testimony of a pulmonologist illustrating the impact Carolinas' proposed facility would have on not only Piedmont's existing specialty services but also specialty physicians' ability to maintain their proficiency as to certain skills due to the decline in the demand for those skills. The ALC found that the "[l]oss or paring of Piedmont's specialty programs would be detrimental to York County citizens, especially those living in the western, more rural part of the county farther away from [Carolinas'] specialty facilities in North Carolina ." (emphasis added). Again, Carolinas has not challenged any of the ALC's findings of fact as not being supported by substantial evidence.
**97 The ALC properly identified the "existing distribution of the health service(s)," as required by Criterion 22, by referencing Piedmont and physician providers in York County. Further, the ALC properly considered the impact Carolinas' proposed facility would have on that distribution in order "to functionally balance the distribution to the target population." The ALC implicitly recognized that, in balancing the distribution of health system resources, DHEC may not ignore the needs of citizens in the western part of York County now being served by Piedmont and physicians practicing in that area.
c. Criterion 23(a)
Criterion 23 is entitled "Adverse Effects on Other Facilities" and falls under the general category of Health System Resources. §§ 801.1, 802.23. Criterion 23(a) states, "The impact on the current and projected occupancy rates or use rates of existing facilities and services should be weighed against the increased accessibility offered by the proposed services."
Carolinas argues the ALC focused solely on the adverse financial impact that Carolinas' proposed facility would have on Piedmont's existing facility, and the "sole purpose and practical effect of the ALC's ruling in this regard was to protect Piedmont's market share from competition." While the ALC did not address the increased accessibility offered by Carolinas' proposed facility in its conclusions of law concerning Criterion 23(a), the ALC recognized the increased accessibility offered by both Carolinas' and Piedmont's respective proposed facilities in its findings of fact. Nevertheless, the ALC found Piedmont's proposed 100-bed facility would provide superior accessibility to meet the rapid population growth in northern York County. The ALC further found Carolinas would provide inferior accessibility to medically underserved patients due to the restrictions York County physicians in the CPN had placed on accepting these patients.[7] Therefore, the Amended **98 Final Order as a whole reflects the ALC's proper balancing of the impact of Carolinas' proposed facility on the occupancy rates of Piedmont's existing facility against the increased accessibility offered by Carolinas' proposed facility as required by Criterion 23(a).
Based on the foregoing, the ALC properly applied Project Review Criteria 16(c), 22, and 23(a) without any discriminatory purpose. We acknowledge that the proper application of these criteria in any case may have the effect of protecting competing providers who already have a presence in the service area, but this particular group of providers is not limited to in-state interests.[8] See *643 Hazel II, 813 F.3d at 154 ("The [D]ormant Commerce Clause is exclusively designed to address the 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " (quoting Granholm v. Heald , 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) ) ); id. (rejecting the appellants' argument that Virginia's CON requirement "discriminates in favor of incumbent health care providers at the expense of new, predominantly out-of-state firms" because "incumbency bias in this context is not a surrogate for the 'negative[ ] impact [on] interstate commerce' with which the [D]ormant Commerce Clause is concerned" (first and second alterations in original) (quoting Hazel I , 733 F.3d at 543 ) ). We find nothing in the record showing a discriminatory effect on interstate commerce from the proper application of these criteria. See id. at 153 (stating that in order to prove discriminatory effect, the party asserting a Dormant Commerce Clause violation must show that the state law, "if enforced, would negatively impact **99 interstate commerce to a greater degree than intrastate commerce" (quoting Hazel I , 733 F.3d at 543 ) ). Likewise, there is nothing in the record showing that the ALC's application of these criteria places an undue burden on interstate commerce. See id. at 157 (holding that those asserting a Dormant Commerce Clause violation " 'bear[ ] the burden of proving that the burdens placed on interstate commerce outweigh' [a law's] local benefits." (quoting LensCrafters, Inc. v. Robinson , 403 F.3d 798, 805 (6th Cir. 2005) ) ). Therefore, we find no Dormant Commerce Clause violation in the application of these criteria.
2. Need
Carolinas next challenges the ALC's application of criteria 2(a), 2(b), 2(c), and 2(e).[9] With regard to these criteria, Carolinas argues (1) the ALC applied these criteria to reduce patient outmigration to North Carolina, which discriminates against, and burdens, interstate commerce, (2) the ALC's application of these criteria "seeks to limit out-of-state and out-of-county interests from accessing the local market," and (3) the ALC provided Piedmont with an advantage over Carolinas by considering Piedmont's transfer of beds from its Rock Hill facility and Piedmont's resulting superior ability to accommodate population growth-Carolinas contends that it could not lawfully transfer beds from its North Carolina facilities pursuant to the Bed Transfer Provision of the 2004-2005 State Health Plan-and this advantage discriminates against out-of-state hospital systems. We will address these arguments in turn. But first, we will set forth the pertinent provisions in Criterion 2.
Criterion 2 is entitled "Community Need Documentation" and falls under the general category of "Need for the Proposed Project." §§ 801.1, 802.2. Criterion 2 states, in pertinent part,
a. The target population should be clearly identified as to the size, location, distribution, and socioeconomic status (if applicable).
**100 b. Projections of anticipated population changes should be reasonable and based upon accepted demographic or statistical methodologies, with assumptions and methodologies clearly presented in the application. The applicant must use population statistics consistent with those generated by the state demographer, State Budget and Control Board.
c. The proposed project should provide services that meet an identified (documented) need of the target population. The assumptions and methods used to determine the level of need should be specified in the application and based on a reasonable approach as judged by the reviewing body. Any deviation from the population projection used in the South Carolina Health Plan should be explained.
....
e. Current and/or projected utilization should be sufficient to justify the expansion *644 or implementation of the proposed service.
§§ 802.2.
As to the ALC's application of these criteria, Carolinas first argues the goal of reducing patient outmigration to North Carolina discriminates against and burdens interstate commerce. We disagree.
Patient outmigration data is typically used in the CON application process to demonstrate the need for an additional provider or service in a particular service area, and the outmigration from one service area to another usually occurs intrastate. In other words, need can be shown by evidence of residents traveling to a provider located outside the service area. See Marlboro Park Hosp. v. S.C. Dep't of Health & Envtl. Control , 358 S.C. 573, 578, 595 S.E.2d 851, 853 (Ct. App. 2004) (stating evidence considered by the ALC "undisputedly related to core issues addressed during [DHEC's staff review] hearing"); id. at 578 n.2, 595 S.E.2d at 853 n.2 (identifying two core issues in DHEC's staff review hearing as the need for the proposed outpatient surgical center and the project's adverse impact on existing providers and listing 1997 outmigration data compiled by the Budget and Control Board as among the evidence that "dealt squarely with the issues before the [ALC]"). While some of these residents may live in close proximity to a provider outside the **101 service area, many would experience a significant reduction in travel time by the addition of a service or provider within the service area.
Therefore, the goal of reducing outmigration reflects a legitimate concern regarding patient travel time, which obviously can affect health outcomes in an emergency. While the reduction of outmigration may reduce patient travel to a neighboring state when the service area happens to border another state, the very purpose of this case is the issuance of a CON to build a hospital to be located in South Carolina . Therefore, the analysis must focus on participation in South Carolina's healthcare market rather than "the flow of patients in interstate commerce" as suggested by Carolinas. Further, reduction of patient travel to a neighboring state does not limit participation in South Carolina's healthcare market to only those providers with in-state interests. See Hazel II, 813 F.3d at 153 (stating that in order to prove discriminatory effect, the party asserting a Dormant Commerce Clause violation must show that the state law, "if enforced, would negatively impact interstate commerce to a greater degree than intrastate commerce" (quoting Hazel I , 733 F.3d at 543 ) ).
As to community need, presumably, either Piedmont's proposed facility or Carolinas' proposed facility would meet the need for sixty-four more general hospital beds in York County. However, the ALC's analysis of which proposal would best meet community need as set forth in criteria 2(a), 2(b), 2(c), and 2(e) was more complex:
In addition to meeting the need for new hospital services, Piedmont's application was specifically intended to strengthen the York County healthcare system by reducing outmigration from York County. While patients have sought medical services outside of York County for years, primarily in the Charlotte area, the outmigration accelerated from 2005 to 2011. The effects of the outmigration, which are detailed in the relevant Findings of Fact and are incorporated herein, reduced the ability of Piedmont and many of the independent physicians on Piedmont's medical staff to meet the healthcare needs of York County residents. Piedmont demonstrated by a preponderance of the evidence that the establishment of [its proposed facility] would strengthen the capacity of existing York County providers to meet those **102 needs. For these reasons, Piedmont best meets § 802.2(a, b, c, e).
The ALC also concluded,
One of the principal differences between the applicants is that the approval of [Carolinas' proposed facility] would have the effect of causing the erosion of quality of care at Piedmont and among specialists practicing there as a result of the diminution in the volume of patients and the degradation of the payor mix of the patients who would continue to be seen at Piedmont. Consequently, there would be no hospital in York County providing many *645 of the high quality and tertiary services that Piedmont has added. Alternatively, the establishment of [Piedmont's proposed facility] will ensure that high quality services continue to be provided and added within York County.
The ALC's unchallenged findings of fact support these conclusions. The ALC found outmigration would continue if Carolinas' proposed facility was built in Fort Mill because Carolinas would refer its Fort Mill patients needing specialty care to one of Carolinas' North Carolina facilities providing these types of services rather than to Piedmont's existing facility in Rock Hill.[10] The ALC also found that if Carolinas' proposed facility was built in Fort Mill, Carolinas would further reduce Piedmont's market share, thereby reducing the volume necessary for Piedmont's continued provision of its specialty services to residents of Rock Hill and western York County.[11] Piedmont had already lost a significant volume of **103 complex cases from 2005 to 2011, forcing one of its physicians to terminate use of a new invasive technology acquired by Piedmont in 2009, due to the referral patterns of physicians aligned with Carolinas. In contrast, Piedmont's proposed facility in Fort Mill would strengthen Piedmont's ability to serve residents "throughout York County by increasing the number of patients treated at Piedmont's Rock Hill facility."
While Carolinas would have the court believe the ALC was simply looking out for Piedmont's bottom line, the ALC was looking at the big picture for all of York County, i.e., how to preserve the quality of care and the larger complement of services Piedmont's existing facility provides to York County residents who do not live in the more affluent northern part of the county. These objectives are consistent with the Project Review Criteria, which Carolinas has not challenged, and serve as an additional justification for the goal of reducing outmigration.
As to Carolinas' argument that the ALC's application of the community need criteria "seeks to limit out-of-state and out-of-county interests from accessing the local market," we disagree. As we previously stated, the proper application of the Project Review Criteria may have the effect of protecting competing providers who already have a presence in the service area, but this particular group of providers is not limited to in-state interests.
Carolinas next argues the ALC provided Piedmont with an advantage over Carolinas by considering Piedmont's transfer of beds from its Rock Hill facility when Carolinas could not lawfully transfer beds from its North Carolina facilities and this advantage discriminates against "out-of-state hospital systems." However, even if Piedmont had not proposed to transfer beds from its Rock Hill facility, the ALC's findings support its conclusion that Piedmont best meets criteria 2(a, b, c, e)-these **104 findings indicate Piedmont's proposed facility would better preserve the quality of care and the larger complement of services that Piedmont's Rock Hill facility provides to York County residents who live in Rock Hill or the western, rural part of the county. Therefore, the ALC's approval of Piedmont's proposed bed transfer does not *646 constitute reversible error. See Judy v. Judy , 384 S.C. 634, 646, 682 S.E.2d 836, 842 (Ct. App. 2009) ("Generally, appellate courts will not set aside judgments due to insubstantial errors not affecting the result.").
Further, the ALC also took into account the capacity to expand, i.e., "shell space," that each respective proposed facility would possess in order to accommodate population growth. The ALC concluded Piedmont had the superior capacity to expand, and Carolinas has not presented any authorities or evidence indicating it was unfairly prevented from competing with Piedmont on this basis.
Based on the foregoing, the ALC properly applied Project Review Criteria 2(a), 2(b), 2(c), and 2(e) without any discriminatory purpose. Further, there is nothing in the record of this case showing that the ALC's application of these criteria has a discriminatory effect on interstate commerce. See Hazel I , 733 F.3d at 546 (stating the two tests for determining a violation of the Dormant Commerce Clause are both "fact-bound"); Hazel II , 813 F.3d at 153 (stating that in order to prove discriminatory effect, the party asserting a Dormant Commerce Clause violation must show that the state law, "if enforced, would negatively impact interstate commerce to a greater degree than intrastate commerce" (quoting Hazel I , 733 F.3d at 543 ) ). Likewise, there is nothing in the record supporting Carolinas' argument that the ALC's application of these criteria places an undue burden on interstate commerce. See Hazel II , 813 F.3d at 157 (holding that those asserting a Dormant Commerce Clause violation " 'bear[ ] the burden of proving that the burdens placed on interstate commerce outweigh' [a law's] local benefits." (quoting Robinson , 403 F.3d at 805 ) ). Therefore, we find *647 no Dormant Commerce Clause violation in the application of these criteria.
3. Efficiency
Criterion 17 is entitled "Efficiency" and falls under the general category of "Economic Consideration." §§ 801.1, **105 802.17. Criterion 17 states, "The proposed project should improve efficiency by avoiding duplication of services, promoting shared services[,] and fostering economies of scale or size." § 802.17. The ALC concluded, "Piedmont better satisfies this criterion because its proposal fosters economies of scale by spreading costs over a greater number of beds. Not only will [Piedmont's proposed facility's] 100 beds better accommodate future growth, [Piedmont's proposed facility] is better designed for expansion than is [Carolinas' proposed facility]."
As with criteria 2(a, b, c, e), Carolinas argues the ALC's application of Criterion 17 provided Piedmont with an unfair advantage over Carolinas by considering Piedmont's transfer of beds from its Rock Hill facility. However, Piedmont's bed transfer proposal was not the sole reason for the ALC's determination that Piedmont best met Criterion 17. The ALC also concluded Piedmont's proposed facility was better designed for expansion than Carolinas' proposed facility, and this factor alone allows Piedmont to best meet Criterion 17.
Again, Carolinas does not challenge the constitutionality of any of the Project Review Criteria or the purposes of the CON Act served by these criteria. We find no discriminatory purpose behind the ALC's thoughtful and correct application of these criteria to the complex facts of this case. Further, there is nothing in the record showing that the ALC's application of these criteria has a discriminatory effect on interstate commerce. See Hazel I , 733 F.3d at 546 (stating the two tests for determining a violation of the Dormant Commerce Clause are both "fact-bound"); Hazel II , 813 F.3d at 153 (stating that in order to prove discriminatory effect, the party asserting a Dormant Commerce Clause violation must show that the state law, "if enforced, would negatively impact interstate commerce to a greater degree than intrastate commerce" (quoting Hazel I , 733 F.3d at 543 ) ). Likewise, there is nothing in the record showing that the ALC's application of these criteria places an undue burden on interstate commerce. See Hazel II , 813 F.3d at 157 (holding that those asserting a Dormant Commerce Clause violation " 'bear[ ] the burden of proving that the burdens placed on interstate commerce outweigh' [a law's] local benefits." (quoting Robinson , 403 F.3d at 805 ) ). Therefore, **106 we find no Dormant Commerce Clause violation in the application of these criteria.[12]
CONCLUSION
Accordingly, we affirm the ALC's Amended Final Order.
AFFIRMED.
WILLIAMS and THOMAS, JJ., concur.

This court's previous opinion in this appeal addressed Carolinas' challenge to the ALC's approval of Piedmont's proposal to transfer beds from its existing hospital in Rock Hill to its proposed hospital in Fort Mill and Carolinas' argument that ALC's application of certain Project Review Criteria was arbitrary and capricious. Amisub of South Carolina, Inc. v. S.C. Dep't of Health & Envtl. Control , Op. No. 2017-UP-013 (S.C. Ct. App. filed January 11, 2017). Carolinas did not challenge our disposition of those two issues in its Petition for Writ of Certiorari to the South Carolina Supreme Court. Rather, Carolinas challenged our conclusion that its Dormant Commerce Clause argument was unpreserved for review. The supreme court agreed with Carolinas, reversed our conclusion, and remanded the case to this court for a ruling on the merits of the issue. Amisub of South Carolina, Inc. v. S.C. Dep't of Health & Envtl. Control , Op. No. 27792 (S.C. Sup. Ct. filed April 25, 2018) (Shearouse Adv. Sh. No. 17 at 33).

There are thirty-three criteria for DHEC's review of a project under the CON program. S.C. Code Ann. Regs. 61-15 § 802 (2011) (amended 2012). Throughout this opinion, we cite to the version of a statute or regulation that was in effect when the parties submitted their respective CON applications.

The remaining three applicants appealed the ALC's remand order; however, our supreme court dismissed the appeal because the remand order was interlocutory. Charlotte-Mecklenburg Hosp. Auth. v. S.C. Dep't of Health & Envtl. Control , 387 S.C. 265, 267, 692 S.E.2d 894, 895 (2010).

Carolinas has not challenged any of the ALC's findings of fact as not being supported by substantial evidence. See Spartanburg Reg'l Med. Ctr. v. Oncology &Hematology Assocs. of S.C., LLC , 387 S.C. 79, 89, 690 S.E.2d 783, 788 (2010) ("On appeal from a contested CON case, the reviewing court 'may not substitute its judgment for the judgment of the [finder of fact] as to the weight of the evidence on questions of fact.' " (quoting § 1-23-380(5) ) ); id. ("The ALC presides over the hearing of a contested case from DHEC's decision on a CON application and serves as the finder of fact."); Bursey v. S.C. Dep't of Health & Envtl. Control , 360 S.C. 135, 144, 600 S.E.2d 80, 85 (Ct. App. 2004) (holding that under the " 'substantial evidence' standard of review, the factual findings of the [administrative] agency are presumed correct and will be set aside only if unsupported by substantial evidence"); id. ("Substantial evidence is not a mere scintilla of evidence, nor evidence viewed blindly from one side, but is evidence [that], when considering the record as a whole, would allow reasonable minds to reach the conclusion that the agency reached in order to justify its action.").

§§ 802.16(c), .22, .23(a) (2011).

§ 44-7-210(C).

The ALC highlighted the evidence showing that those CPN primary care practices representing eighty percent of the York County patient referrals to Carolinas' facilities were either "not accepting new uninsured, Medicaid, or Medicare patients" or were "not accepting new uninsured patients unless the patient paid in advance [seventy] percent of a new patient charge" ranging from $290 to $800. Approximately nineteen months later, these practices were "still not scheduling appointments for new Medicaid or Medicare patients." Further, Carolinas' records showed "relatively low percentages of Medicaid and uninsured care by" York County CPN physicians. Recognizing that the CPN primary care physicians "would function as the gatekeepers for" Carolinas' proposed Fort Mill facility, the ALC stated, "If the flow of medically underserved patients into [the CPN] primary care offices is restricted, the referrals and ultimate admissions of those individuals into [Carolinas' proposed Fort Mill facility] would be restricted as well." Carolinas has not challenged these findings of fact.

For example , Carolinas owns and manages Roper Hospital in Charleston and, thus, has an existing presence in the corresponding service area.

§§ 802.2(a), (b), (c), (e) (2011). Subpart (d) of Criterion 2, which addresses the reduction, relocation, or elimination of a facility or service, does not apply to either CON application in the present case. See § 802.2(d) (2011).

Carolinas' proposed Fort Mill facility would provide only primary and secondary care. One of Piedmont's experts, Joel Grice, testified that even if the competing CON applicant had been a provider's hospital offering specialty services and located within South Carolina but outside of York County, outmigration from York County would still be a concern.

In its reply brief, Carolinas argues, "The ALC's ruling fails to demonstrate that [the] purpose [of maintaining needed healthcare services in York County] is supported by sufficient evidence under the strict scrutiny analysis." Carolinas also alleges "Piedmont presented no concrete evidence that Piedmont will discontinue specialized or complex services if Carolinas is granted the Fort Mill CON." Carolinas' allegations are simply unfounded. Piedmont presented the testimony of Arun Adlakha, M.D., who had requested Piedmont to acquire an instrument that would allow him to perform navigational bronchoscopies. Piedmont acquired the instrument, which was the first of its kind in the greater Charlotte area. When it was first placed in operation, Dr. Adlakha performed enough procedures to maintain his proficiency. However, after the patient volume for this service significantly declined, Dr. Adlakha decided "to terminate the use of the instrument as he found it 'very difficult to maintain [his] proficiency and justify keeping it for so long.' " Dr. Adlakha attributed the decrease in patient volume to CPN's referral practices.

Carolinas also argues the ALC erred in failing to conduct the proper Dormant Commerce Clause analysis because the ALC stated, "The same plan, criteri[a,] and analysis would have been utilized regardless of whether competing applicants were out-of-state or in-state providers." Carolinas asserts that this is the incorrect standard for a Dormant Commerce Clause analysis. Because the ALC properly applied the provisions of the CON Act, the 2004-2005 State Health Plan, and the Project Review Criteria without any discriminatory purpose or effect, we find no reversible error. See Judy , 384 S.C. at 646, 682 S.E.2d at 842 ("Generally, appellate courts will not set aside judgments due to insubstantial errors not affecting the result.").