RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

DIPENDRA TIWARI; KISHOR SAPKOTA; GRACE HOME
CARE, INC.,

    *Plaintiffs-Appellants*,

  *v.*

ERIC FRIEDLANDER, in his official capacity as
Secretary of the Kentucky Cabinet for Health and
Family Services; ADAM MATHER, in his official
capacity as Inspector General of Kentucky,

    *Defendants-Appellees*,

KENTUCKY HOSPITAL ASSOCIATION,

    *Intervenor Defendant-Appellee*.

> No. 21-5495

─────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:19-cv-00884—Gregory N. Stivers, District Judge.

Argued: January 27, 2022

Decided and Filed: February 14, 2022

Before: SUTTON, Chief Judge; GUY and DONALD, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Andrew H. Ward, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants. David T. Lovely, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellees Friedlander and Mather. David M. Dirr, DRESSMAN BENZINGER LA VELLE PSC, Crestview Hills, Kentucky, for Appellee Kentucky Hospital Association. **ON BRIEF:** Andrew H. Ward, INSTITUTE FOR JUSTICE, Arlington, Virginia, Jaimie N. Cavanaugh, INSTITUTE FOR JUSTICE, Minneapolis, Minnesota, for Appellants. David T. Lovely, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellees Friedlander and Mather. David M. Dirr, Christopher B. Markus, DRESSMAN BENZINGER LA VELLE PSC, Crestview Hills, Kentucky, for Appellee Kentucky Hospital Association.

---

**OPINION**

---

SUTTON, Chief Judge.  Dipendra Tiwari and Kishor Sapkota sought to establish a home healthcare company, called Grace Home Care, that would focus on serving Nepali-speaking individuals in the Louisville area.  Like other companies that provide healthcare services, home healthcare companies face a number of regulations.  One of them is a certificate-of-need requirement, which restricts the number of such companies that may serve each county in Kentucky.  When the Commonwealth denied their certificate-of-need application, Tiwari and Sapkota filed this lawsuit.  They claim that the regulation violates their Fourteenth Amendment right to earn a living, serves only the illegitimate end of protecting incumbent home healthcare companies from competition, and through it all lacks a rational basis.  At the motion to dismiss stage, the district court allowed the case to proceed to discovery.  On summary judgment, the district court upheld the law.  We affirm.

I.

Certificate-of-need laws control the number of healthcare resources in a geographical area.  Unlike other licensing laws, these programs require the applicant to demonstrate a public need for its service in a given area to "prevent overinvestment in and maldistribution of health care  facilities." *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 153 (4th Cir. 2016).  While certificate-of-need laws have fallen out of favor in the last  few decades, many States still use them to regulate different parts of the healthcare industry.  *See id.*; Emily Whelan Parento, *Certificate of Need in the Post-Affordable Care Act Era*, 105 Ky. L.J. 201, 256 (2017).  At least 16 States today have certificate-of-need laws for home healthcare services. *See* Parento, *supra*, at 256; Certificate of Need State Laws, Nat'l Conf. of State Legislatures,  https://www.ncsl.org/research/health/con-certificate-of-need-state-laws.aspx#Interactive%20Map (last visited Feb. 9, 2022).

Anyone wishing to establish a "health facility" or to make certain substantial changes to an existing health facility in Kentucky must obtain approval from the State.  Ky. Rev. Stat.

§ 216B.061(1); *see also id.* § 216B.020. A "health facility" broadly includes "any institution, place, building, agency, or portion thereof" that is "used, operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care," among other services. *Id.* § 216B.015(13). A covered entity must apply for a certificate of need to Kentucky's Cabinet for Health Services, the agency that administers the program. *Id.* § 216B.062; *see also id.* §§ 216B.040(1), 216B.015(6). The application goes through a review process, *id.* §§ 216B.040, 216B.095, which requires public notice with the opportunity for "affected persons"—often the applicant or a competitor—to request a hearing, *id.* § 216B.085(1)–(2); 900 Ky. Admin. Regs. 6:060.

By statute, the State looks at several factors in reviewing an application: (1) "interrelationships and linkages" to existing care; (2) "costs, economic feasibility, and resources availability"; (3) "quality of services"; (4) "need and accessibility" in the desired geographic area; and (5) "consistency with" the State Health Plan as determined by the Health Services agency. Ky. Rev. Stat. § 216B.040(2)(a)(2); *see* 900 Ky. Admin. Regs. 5:020.

The last two factors—"need and accessibility" and "consistency with plans"—tend to be the primary guideposts. In calculating need, the Plan compares the forecasted demands of the population to the number of people already receiving the service. The State Health Plan also contains guidelines and regulations for each type of facility or service. Ky. Rev. Stat. § 216B.015(28).

Dipendra Tiwari and Kishor Sapkota sought to establish a home healthcare company in Louisville. Named Grace Home Care, the company would provide healthcare services at the patient's home and serve, among other patients, those who spoke Nepali. Home healthcare, as Kentucky defines it, includes skilled nursing; therapeutic services such as physical, speech, or occupational therapy; and home healthcare support: bathing, using the bathroom, and taking medication. Kentucky's Health Plan requires new entrants to show that at least 250 patients need the service while it requires existing companies to show that at least 125 patients need the expanded service.

Unique among home healthcare companies, Grace Home Care wishes to focus its services on Louisville's Nepali residents.  Because positive health outcomes often occur when the patient is comfortable with the provider, Tiwari and Sapkota thought Grace Home Care could deliver superior care for these Kentuckians by pairing them with home healthcare workers who spoke their language and understood their culture.

In March 2018, Grace Home Care submitted its certificate-of-need application.  As permitted under state law, Baptist Health, which also runs a home healthcare company in Louisville, intervened and argued that Grace Home Care's application did not fit the State's Health Plan because Jefferson County's need calculation fell below the threshold for new providers.  Grace Home Care did not respond, and the State denied the application.

At that point, Tiwari, Sapkota, and Grace Home Care could have challenged this administrative decision in state court.  Under Kentucky law, they could have claimed that the decision was "[a]rbitrary," unsupported by substantial evidence, or otherwise unlawful.  Ky. Rev. Stat. § 13B.150.  But they did not file such a challenge.

They instead filed this lawsuit against various Kentucky agencies and officials in federal court.  They claim that the certificate-of-need law, as applied to home healthcare companies, violates the Due Process, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth Amendment.  The Kentucky Hospital Association successfully moved to intervene as a defendant.

At the outset, the State and the Hospital Association moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The district court rejected the motions in a thoughtful and thorough opinion.  In the absence of discovery, it found plausible the complaint's allegations that the statutory scheme did not serve a rational purpose, reasoning that the law seemed to inhibit rather than further the law's proposed justifications, including lower costs and better care.  *Tiwari v. Friedlander*, No. 19-CV-884, 2020 WL 4745772, at *5–14 (W.D. Ky. Aug. 14, 2020).  As a result, the court ruled, the plaintiffs adequately stated a claim for relief under the Fourteenth Amendment's Due Process and Equal Protection Clauses.  *Id.*

The lawsuit proceeded to discovery and before long dueling summary judgment motions, which featured competing expert reports. In the face of this expanded record, the court determined that the State's justifications for the law rationally supported it. *Tiwari v. Friendlander*, No. 19-CV-00884, 2021 WL 1407953, at \*13 (W.D. Ky. Apr. 14, 2021).

II.

*Due Process.* The Due Process Clause of the Fourteenth Amendment prevents a State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The textual focus of the clause is procedural—to require elemental process before the State takes the property of its citizens, infringes on their liberty, or deprives them of life. But this case does not implicate a process dispute. Tiwari and Sapkota do not complain about the nature of the State's procedures for obtaining a license in the sense of fair notice, an opportunity to be heard, or other procedures for determining who gets a license and who doesn't.

Tiwari and Sapkota instead complain about something else—the substance of Kentucky's certificate-of-need law. They claim that it violates the liberty guarantee of the Due Process Clause. Over time, some substantive due process guarantees have become anchored in the language of the Bill of Rights. If, for example, Kentucky had denied this certificate-of-need application based on the applicant's unwillingness to speak favorably about the Governor, that denial would violate substantive due process, namely the free-speech guarantee of the First Amendment as incorporated through the liberty clause of the Fourteenth Amendment. But Tiwari and Sapkota do not rest their substantive due process claim on any of the first eight provisions of the Bill of Rights, nearly all of which the U.S. Supreme Court has incorporated into the Due Process Clause.

That leaves another possibility—that the certificate-of-need requirement violates a fundamental right unanchored in the Bill of Rights but recognized by the U.S. Supreme Court all the same. Infringements on such fundamental rights receive skeptical review from the courts. But the claimants do not make any such argument.

That brings us to the last possibility. Even if the claimants do not allege that Kentucky has violated a provision of the Bill of Rights or another fundamental right, they still may invoke

the Fourteenth Amendment to target laws that impose substantive restrictions on individual liberty, including the right to engage in a chosen occupation. *See Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *Truax v. Raich*, 239 U.S. 33, 41 (1915). The threshold for invalidating a state law on this basis is high. Economic regulations, even those affecting an individual's liberty to work in a given area, violate due process only when they "impose[] burdens without any rational basis for doing so." *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010) (quotation omitted). In contrast to laws that are presumptively problematic—say laws that allocate benefits based on race, religion, or speech—economic laws carry "a presumption of legislative validity," requiring the challenger to show that there is "no rational connection between the enactment and a legitimate government interest." *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir. 2011). All laws, whether the challenge arises under the Due Process or Equal Protection Clause, must satisfy rational-basis review, and as a result we look to cases resolved in this area under both Clauses.

Right or wrong, rational-basis review epitomizes a light judicial touch. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955). So long as some "plausible" reason exists for the law—any plausible reason, even one that did not inspire the enacting legislators—the law must stand, no matter how unfair, unjust, or unwise the judges may see it as citizens. *Heller v. Doe*, 509 U.S. 312, 320, 324, 330 (1993); *Nordlinger v. Hahn*, 505 U.S. 1, 11, 17–18 (1992). States need not "convince the courts of the correctness of their legislative judgments," *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981), and courts cannot subject legislative choices "to courtroom fact-finding," *Beach Commc'ns*, 508 U.S. at 315. A legislature's "rational speculation unsupported by evidence or empirical data" suffices. *Id.* An essential premise of all this is not that legislatures are beyond enacting silly or ineffective laws; it is that "even improvident decisions will eventually be rectified by the democratic process." *Vance v. Bradley*, 440 U.S. 93, 97 (1979). So it is that a law may be incorrigibly foolish but constitutional.

To critics of rational-basis review, the standard is too daunting. Whereas a claim implicating a fundamental right requires the State to run the gauntlet of strict scrutiny, a claim

implicating rational-basis review seems to require the *individual* to run the gauntlet of strict scrutiny—so many and so modest are the explanations for upholding such laws.  But that exaggerates.  While the route is difficult, it is not beyond category.  Laws premised on utterly illogical grounds or fantasy premises will not be upheld.

In this area, as in many areas, the concrete tends to inform the abstract.  Take the measure of some cases that rejected a rational-basis challenge to a statute.  At stake in *Clover Leaf Creamery* was whether a Minnesota statute that banned sales of milk in plastic containers rationally served the goal of protecting the environment.  449 U.S. at 458–60.  The Minnesota Supreme Court invalidated the law based on "impressive supporting evidence" showing that non-plastic containers did more harm than good for the environment.  *Id.* at 463–65.  The U.S. Supreme Court reversed, concluding that, even if the statute did not ultimately serve the desired end of protecting the environment, it was "at least debatable" for the legislature to think so.  *Id.* at 469 (quotation omitted).  "Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the question," the Court concluded, so long as the legislature "*could rationally have decided* that" the law would serve that interest.  *Id.* at 466.

At stake in *Vance v. Bradley* was whether a federal statute that required Foreign Service employees to retire at the age of 60 rationally served any legitimate end.  440 U.S. at 94–95.  The government defended the age-based restriction on the theory that it rationally related to the officers' ability to perform their tasks abroad.  *Id.* at 103–04.  The Court upheld the law despite the plaintiffs' considerable evidence that many overseas posts do not pose security or safety concerns, that many Foreign Service personnel under 60 have health problems, that many employees in the area had successfully worked long after 60 in the past, and that age is not related to susceptibility to certain diseases and ailments commonly linked to life overseas.  *Id.* at 110.  Reasoning that the challengers had the burden of showing that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true," *id.* at 111, the Court upheld the retirement requirement because Congress arguably could believe that those over 60 were more susceptible to these risks, which "immunize[d]" the law "from constitutional attack," *id.* at 112.

*Western & Southern Life Insurance Co. v. State Board of Equalization of California* came to a similar conclusion. 451 U.S. 648 (1981). It concerned a "retaliatory" tax placed on out-of-state insurance companies designed to deter States from imposing steep taxes on California insurers. *Id.* at 650, 669–70. Although scholars and economists "doubt[ed] the wisdom" of the tax and believed it was "not an effective means for" accomplishing this goal, the Court upheld it under rational-basis scrutiny because the legislature still "*rationally could have believed* that the retaliatory tax would promote its objective." *Id.* at 670–72.

Not all laws have cleared this low bar, however. Several cases go the other way. Hence the Court concluded it was constitutionally irrational to believe that public officials' familiarity with a community depends on their owning property there. *Quinn v. Millsap*, 491 U.S. 95, 107–08 (1989). Hence the Court concluded it was constitutionally irrational for a State to conclude that granting tax benefits only to those veterans who have lived in the State after a fixed year before the law's passage would encourage new veterans to move there. *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 619 (1985). Hence the Court concluded it was constitutionally irrational for a county to believe that assessing *recently sold* property based on purchase price would lead to a uniform assessment of *all* property given the disparate treatment for comparable unsold property. *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*, 488 U.S. 336, 345 (1989). Other like-reasoned cases featured laws that contained logically untenable connections to their purported aims. *See, e.g.*, *Williams v. Vermont*, 472 U.S. 14, 23–25 (1985) (invalidating a Vermont vehicle-use tax that impermissibly treated citizens differently based on when they became residents); *Plyler v. Doe*, 457 U.S. 202, 228–30 (1982) (invalidating a Texas law that withheld from school districts funds for the education of the children of illegal immigrants); *Zobel v. Williams*, 457 U.S. 55, 60–64 (1982) (invalidating an Alaska dividend distribution program that impermissibly based payments on length of residence); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159, 159 (1977) (per curiam) (invalidating a law that required parish commission appointees to own property there); *Lindsey v. Normet*, 405 U.S. 56, 77–78 (1972) (invalidating an Oregon law that required tenants to pay a double-rent fee in order to appeal a judgment); *James v. Strange*, 407 U.S. 128, 131, 141–42 (1972) (invalidating a Kansas recoupment statute that denied indigent defendants various protective exemptions provided for others); *Turner v. Fouche*, 396 U.S. 346, 363–64 (1970) (invalidating a requirement that

members of a county board of education own real property).  Through them all, these cases involved situations in which the law failed to serve a legitimate end or the law in application did not have a rational connection to its purpose.

Of special interest to us are the fortunes of licensing laws, which have much in common with certificate-of-need laws.  Many cases uphold these laws, often because the licensing requirements arise in a heavily regulated field.  *See, e.g.*, *Williamson*, 348 U.S. at 490 (eyeglasses); *N.D. State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 158, 164–67 (1973) (pharmacies); *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (physicians); *New Orleans v. Dukes*, 427 U.S. 297, 303–06 (1976) (per curiam) (street vendors); *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284–88 (2d Cir. 2015) (dentistry); *Powers v. Harris*, 379 F.3d 1208, 1211 (10th Cir. 2004) (casket sales).

But to the extent Justice Douglas meant to predict that the "day is gone" when Fourteenth Amendment challenges to state licensing laws could succeed, *Williamson*, 348 U.S. at 488, that did not turn out to be accurate.  Our court and others have granted relief in the context of licensing laws that serve only protectionist goals and otherwise lack a rational basis for the lines they draw or the burdens they impose.  *See Craigmiles v. Giles*, 312 F.3d 220, 224–29 (6th Cir. 2002) (invalidating a statute that permitted only licensed funeral home directors, but no one else, to sell caskets); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223–27 (5th Cir. 2013) (same); *Merrifield v. Lockyer*, 547 F.3d 978, 991–92, 991 n.15 (9th Cir. 2008) (invalidating a statute that exempted some pest control operators from licensing but not others); *see generally* Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 Colum. L. Rev. 1689 (1984) (claiming that the Constitution should bar purely protectionist laws that do not serve a public good).  Some state courts, for what it is worth, have come to similar conclusions in challenges to licensing regulations, though usually based on state constitutions and usually based on what appears to be a more rigorous form of scrutiny.  *See, e.g.*, *Patel v. Tex. Dep't of Licensing and Regul.*, 469 S.W.3d 69, 90 (Tex. 2015) (invalidating "oppressive" licensing requirements for eyebrow threaders because they went beyond any rational relationship to consumer protection and safety); *see id.* at 110–18 (Willett, J., concurring); *Ladd v. Real Est. Comm'n*, 230 A.3d 1096, 1106,

1111–13 (Pa. 2020) (invalidating licensing requirements for short-term vacation property managers on similar grounds).

Measured by the general rational-basis test and the specific ways in which it has been applied, Kentucky's certificate-of-need law passes, perhaps with a low grade but with a pass all the same. As for the goal of the law, the State contends that it furthers healthcare in Kentucky. All agree that this aim is legitimate. The only question is whether the law serves this objective, whether a rational connection exists between its ends and its avowed means—namely, increasing cost efficiency, improving quality of care, and improving the healthcare infrastructure in place.

Start with cost efficiency. One could plausibly think that, by tailoring services to need in a given market, current providers could use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations. Providers could use their enhanced purchasing power to buy supplies and equipment at reduced prices. The increased patient volume also could permit the companies to spread fixed costs across more patients.

Move to quality of care. The State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service. Whether by the downstream benefits of achieving scale or the quality-improving expertise and specialization that come from repeated services within a market, the State could plausibly think that the certificate-of-need program would increase quality in one way or another.

Home healthcare services are heavily regulated too. Deemed medical services under Kentucky law, they may be performed only with a doctor's prescription. *See* 902 Ky. Admin. Regs. 20:081 § 2. Prices in this market often are determined by the government (Medicare and Medicaid) or private insurance companies, and patients usually pay a minor cost of the care. Price shopping for healthcare services is the exception, not the rule. Heavy regulation of supply and pricing often comes with heavy regulation of the number of suppliers in the market.

Kentucky also has not made an eccentric policymaking decision. Far from being alone in applying certificate-of-need requirements to the home healthcare industry, it has considerable company in doing so, as at least 16 States have made this decision. *See* Parento, *supra*, at 256;

Certificate of Need State Laws, *supra*.   Nor are we alone in upholding such laws against Fourteenth Amendment challenges.   Other circuits have reached the same conclusion.   *See Birchansky v. Clabaugh*, 955 F.3d 751, 757–58 (8th Cir. 2020); *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 547–48 (4th Cir. 2013).   Certificate-of-need "laws in general have been recognized as a valid means of furthering a legitimate state interest."   *Planned Parenthood of Greater Iowa, Inc. v. Atchison*, 126 F.3d 1042, 1048 (8th Cir. 1997) (collecting cases).   No court to our knowledge has invalidated a healthcare certificate-of-need law under the rational-basis requirements of the Fourteenth Amendment.

Tiwari and Sapkota have several responses, many formidable.

*First*, they point to considerable evidence showing that, in practice, certificate-of-need laws often undermine the very goals they purport to serve—lower costs and better care—whether with respect to healthcare in general or home healthcare in particular.   There indeed is a rich body of economic scholarship questioning the value of certificate-of-need laws and often showing their pernicious effects, particularly when it comes to incumbency protection and undue barriers to new entrants in the market.   *See, e.g.*, Thomas Stratmann & Jacob W. Russ, *Do Certificate-of-Need Laws Increase Indigent Care?* (Mercatus Ctr. Geo. Mason, Working Paper No. 14-20, 2014).   Particularly galling for entrepreneurs like Tiwari and Sapkota is the reality that only those with these certificates can reap the often-government-fixed rates for healthcare—a market in which little price shopping occurs—and the reliable profits that follow.   Barriers to entry thus operate as an additional monopolistic coating on an already controlled market.   The district court's motion-to-dismiss opinion ably lays out the powerful case against these laws—cataloguing the ill effects they wreak on entrepreneurs and consumers alike and observing how Kentucky's law seemingly "worsens all problems it purports to fix."   *Tiwari*, 2020 WL 4745772, at *2, *8–11.

History has not been good to certificate-of-need laws either.   They became a sensation in the 1970s, when Congress used its conditional spending power to require States to enact them. Through the National Health Planning and Resources Development Act of 1974, Congress required States to enact such laws in return for federal healthcare funding.   *See id.* at *4; *Slaughter v. Dobbs*, No. 20-CV-789, 2022 WL 135424, at *2 (S.D. Miss. Jan. 13, 2022).   Eight

years later, as a result, every State in the country, save for Louisiana, had adopted a healthcare certificate-of-need program. *Slaughter*, 2022 WL 135424, at *2.

What went up eventually went down. In 1987, based on experiences gone awry and considerable critical scholarship, Congress repealed the law and its requirement that States adopt such laws. *Id.* The most populous State in the country and one not congenitally adverse to regulation, California, also repealed its restrictions. Parento, *supra*, at 222. Since 1987, the federal government—across different agencies and ideologically diverse administrations—continues to advocate against these laws, noting their tendency to increase costs while decreasing access and quality of care. Even so, 35 States still have some form of certificate-of-need laws, and as noted 16 States still apply them to home healthcare companies. But the public defenders of such laws are a shrinking minority.

While we cannot claim to have the expertise of the economists or other scholars critical of these laws or the knowledge of the federal and state legislators that have repealed them, we can say that the judgment that this was a failed experiment has the ring of truth to it. Were we Kentucky legislators ourselves, we would be inclined to think that certificate-of-need laws should be the exception, not the rule, and perhaps have outlived their own needs.

The problem for the challengers is that this is not the inquiry. "The Constitution does not prohibit legislatures from enacting stupid laws." *N.Y. State Bd. of Elections v. López Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring). A claimant does not prevail in a rational-basis case simply by severing the stated links between a law and its rationales with on-the-ground evidence that undermines the law—or showing that the lived experiences of the law have not delivered on its promises. The courts would be busy indeed if a law could be invalidated whenever evidence proves that it did not work as planned. Our custom instead is to assume that democracy eventually will fix the problem. That is because our Federal "Constitution presumes that, absent some reason to infer antipathy," flawed laws will "eventually be rectified by the democratic process." *Vance*, 440 U.S. at 97.

The other problem with this argument turns on the limited role the Fourteenth Amendment has to play in this area. Whatever the substantive limits of the Due Process Clause

may be, they do not establish a cost-benefit imperative. The defect with certificate-of-need laws is rarely that there is *no* rational benefit to them in a heavily regulated industry like healthcare. The real problem, and the most potent explanation for criticizing them, is that the costs of these laws—needless barriers to entry, protectionism for incumbents, the improbability of lowering prices by decreasing supply—*outweigh* their modest regulatory benefits. Yet it is precisely such weighing of costs and benefits that is so beyond judicial capacity. Who among us can identify a principled basis for concluding that some laws involve an irrational weighing of costs and benefits while others do not? Once we identify a plausible rational benefit of a law, the policymaking calculation of whether to adopt the law in the face of competing costs is eminently a legislative task, not a judicial one. Any other approach would require us not just to decide whether a plausible rational basis exists but then to balance out the totality of costs and benefits, a value-laden task that no two judges could ever do in the same way—and that even the same judge might do differently at different times during his tenure. It is one thing when legislatures enact laws on an ad hoc and inconsistent basis. It is quite another when judges remove them from the democratic process on an ad hoc and inconsistent basis.

*Second*, this last question and answer largely resolve the challengers' next two concerns. With respect to quality of care, Tiwari and Sapkota push back that certificate-of-need laws are illogical, not just bad policy. They again provide ample evidence that incumbents with reduced competition tend to provide lower quality services. And we again do not balk at the general notion that increased competition usually improves quality of care and lowers prices. *Cf. Craigmiles*, 312 F.3d at 226 (noting that "a more competitive casket market would likely lead to that consumer procuring a higher quality casket"). Nor can we deny that the conceivable benefits of these laws would seem to diminish in the comparatively cheaper, simpler, and more labor-intensive home healthcare market. Providers of home healthcare, for example, rarely have large upfront capital costs, as say a hospital would. But we cannot say that it is irrational for a legislator to think otherwise about the law's merits, at least in the healthcare market, a market that has been heavily regulated for decades and in which the State is a buyer and a seller. The ways of Adam Smith, for good or ill, do not describe the ways of the healthcare market in America circa 2022.

None of Tiwari and Sapkota's evidence puts the law's connection to quality beyond dispute, even if it strengthens considerably one side of the policy dispute. Healthcare is uniquely complex, with "its own idiosyncrasies," and with many different metrics upon which to gauge success. *Colon Health Ctrs.*, 813 F.3d at 158. It is at least rationally possible for legislators in Kentucky (and 15 other States) to think that "the unique aspects of the heath care market [] affect the behaviors of consumers and producers in ways not encountered in other industries." R.84-4 at 15.

The State, moreover, has some evidence of its own on this score. Economies of scale, it notes, permit providers to reinvest profits from higher patient volumes into other areas of the business, say by buying expensive technology to improve patient care across the State or by providing better training for new employees. "[T]here is a relationship between the number of patients" a company serves, the State's expert plausibly says, "and its ability to offer programs and services that enhance the quality of care." *Id.* at 23. One certified home healthcare company says that it leverages the scale of its patient population to offer specialized programs for various conditions that home healthcare patients may face. The same company also claims that it would not be able to absorb the costs of technological investments—like electronic health records, tablets for caregivers, or remote telehealth equipment—without the patient volume that the Kentucky law helps to maintain. It is even possible that scale makes it easier for some companies to do what the claimants hope to do here—hire employees who can meet the language and cultural needs of their clients. While the denial of this license would seem to hurt efforts to match Nepali patients with home healthcare workers who speak their language in Louisville, it is at least conceivable that a system that encourages scale will further the broader goal of having healthcare companies that have employees who can match service options to service needs.

*Third*, and relatedly, Tiwari and Sapkota point to studies and expert testimony showing that certificate-of-need laws end up leading to higher healthcare costs for the State and its consumers—the opposite of the avowed goal of the law. Time and experience, they say, have shown that what once might have been constitutional no longer is. Thus: "[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *United States v.*

*Carolene Prods. Co.*, 304 U.S. 144, 153 (1938).   We don't disagree.   But the possibility of changed circumstances doesn't change something else either—the modest nature of the rational-basis inquiry.   Even if time has shown that certificate-of-need laws do not lower costs for patients, that does not mean they do not create cost efficiency for providers.   That is one rational explanation of the law, and no evidence categorically defeats the point—or for that matter categorically defeats the idea that the limitation on the number of home healthcare companies would lead to stabler and more efficient care.   Tiwari and Sapkota's evidence does not reject beyond question the notion that a legislator could at least rationally think that the law would facilitate cost efficiency and that cost efficiency could benefit the public down the road.

Tiwari and Sapkota insist that their evidence is more reliable and more extensive than the State's.   But it is "not within" this court's "competency" to consider who has the most reasonable view.   *Vance*, 440 U.S. at 112 (quotation omitted).   Confirming the difficulty of this endeavor, both parties' experts agree that the studies assessing certificate-of-need laws are imperfect on many dimensions.   The dynamic complexities of this market, the many metrics upon which that care can be measured, and the reality that a State need not proffer more than "rational speculation unsupported by evidence or empirical data" all make it difficult to push this law outside the universe of rationality.   *Beach Commc'ns*, 508 U.S. at 315.

*Fourth*, Tiwari and Sapkota point to our decision in *Craigmiles*, which invalidated a law allowing only licensed funeral directors to sell caskets.   312 F.3d at 228–29.   Yet the differences between that case and this one illustrate the forbidden side of the line.   At issue in *Craigmiles* was a Tennessee law that permitted only licensed funeral directors to sell caskets.   In doing so, the law purported to regulate public health and safety and protect consumers by dictating who could sell caskets, but it did so without regulating the products' quality in any way.   *Id.* at 225. Absent any difference in the caskets sold, no plausible connection could exist between a casket's safety and its seller, whether the seller was a funeral home or a casket maker or a dealer.   The court found the law unconstitutionally irrational and impermissibly protectionist—and rightly so. *Id.* at 229.   A law that serves protectionist ends and nothing else—in that instance to insulate funeral homes from competition in selling caskets—does not satisfy rational-basis review. That essentially is a form of class legislation that the Fourteenth Amendment originally

banned—and still should ban.  *See* John O. McGinnis, *Reforming Constitutional Review of State Economic Legislation*, 14 Geo. J.L. & Pub. Pol'y 517, 529 (2016).

Consistent with *Craigmiles*, we agree that a law defended on protectionist grounds alone—denying individuals a right to ply their trade solely to protect incumbents—would not satisfy rational-basis review.  It is no doubt true that governments sometimes play favorites and sometimes enact protectionist laws, often fairly described as nothing more than wealth transfers.  Think tax breaks for some companies but not others.  Think subsidies for a stadium for a for-profit sports team.  Think redistributionist tax policies and tax credits.  And so on.  But when courts uphold these laws, they tend to do so on the ground that a public interest (other than protectionism or a wealth transfer for its own sake) supports the law.  *See St. Joseph Abbey*, 712 F.3d at 222–23 (rejecting mere protectionism as a legitimate government interest); *Merrifield*, 547 F.3d at 991–92, 991 n.15 (same); *Powers*, 379 F.3d at 1225–26 (Tymkovich, J., concurring) (same); *Sensational Smiles*, 793 F.3d at 288 (Droney, J., concurring in part) (same); *see also Hettinga v. United States*, 677 F.3d 471, 481 (D.C. Cir. 2012) (Brown, J., concurring).

But that is not this case.  Protectionist though this law may be in some of its effects, that is not the only effect it has or the only goal it serves.  As a matter of history, law, economics, and common sense, there is a lifetime of difference between the providing of healthcare and the making of caskets.  In the intensely regulated market of healthcare, Kentucky has shown that its regulations potentially advance a legitimate cause.  Courts no doubt will continue to encounter regulations that fall short of any rational basis.  This is just not one of those cases.

*Fifth*, Tiwari and Sapkota target another protectionist feature of the law.  They argue that the law favors incumbents over new entrants based on the lower patient-need threshold to enter a market (125 versus 250).  This disparity not only favors incumbents, but it also would allow a sharp-elbowed incumbent theoretically to expand whenever the 125-patient threshold was reached, forever prohibiting a start up from obtaining permission to enter the market by meeting the 250-patient threshold.  But a rational basis, even if a debatable one, supports the discrepancy.  The State set the baseline 250-patient threshold at a level where a company "would have sufficient volume to be able to maintain financial viability."  R.84-6 at 20.  New entrants will likely have more overhead and more difficulty spreading those costs than existing market

participants with higher patient volumes.  Hence the lower threshold for the incumbent.  The disparity comports with the law's justifications, or at least a legislator plausibly could think so.

*Sixth*, Tiwari and Sapkota try to recalibrate the rational-basis test itself.  True enough, many thoughtful commentators, scholars, and judges have shown that the current deferential approach to economic regulations may amount to an overcorrection in response to the *Lochner* era at the expense of otherwise constitutionally secured rights.  *See, e.g.*, David E. Bernstein, *The Due Process Right to Pursue a Lawful Occupation:  A Brighter Future Ahead?*, 126 Yale L.J. Forum 287, 287–302 (2016); Randy E. Barnett, *Our Republican Constitution:  Securing the Liberty and Sovereignty of We the People* 222–47 (2016); *Hettinga*, 677 F.3d at 480–83 (Brown, J., concurring).  We appreciate the points and might add a few others.  Is it worth considering whether a similar form of protectionism should receive more rigorous review under the dormant Commerce Clause solely when the entrant happens to be from another State?  Put more specifically, should Tiwari and Sapkota's challenge have a better chance of success if they move to Indiana?  *Cf. Walgreen Co. v. Rullan*, 405 F.3d 50, 59–60 (1st Cir. 2005).  And is there something to Justice Frankfurter's criticism of the dichotomy between economic rights and liberty rights, *see, e.g.*, *Dennis v. United States*, 341 U.S. 494, 526–27 (1951) (Frankfurter, J., concurring), a dichotomy first identified in *Carolene Products*, 304 U.S. at 152 n.4?  One could imagine Susette Kelo, and for that matter Tiwari and Sapkota, thinking their cases involved a liberty right.  *Cf. Kelo v. City of New London*, 545 U.S. 469, 487–90 (2005).  But any such recalibration of the rational-basis test and any effort to create consistency across individual rights is for the U.S. Supreme Court, not our court, to make.

*Seventh*, the claimants point to a recent Mississippi district court decision that allowed a challenge to a home healthcare certificate-of-need law to proceed.  *Slaughter*, 2022 WL 135424, at *1.  Addressing only the "sufficiency of the *Complaint*," the court concluded that the challengers plausibly alleged that a rational basis did not support the law.  *Id.* at *3–6.  In one sense, that case, like the motion-to-dismiss opinion in this case, *Tiwari*, 2020 WL 4745772, at *5–14, confirms what we accept today:  Certificate-of-need laws teeter on the edge of rationality.  In another sense, that case confirms what we cannot resolve today:  How will all other certificate-of-need laws fare under that review?  Mississippi's restriction, it deserves note,

ventured beyond Kentucky's, banning *all* new entry into the market for the last several decades regardless of any "need" for the service. *Slaughter*, 2022 WL 135424, at \*2. As the court put it, "Mississippi's 40-year-old moratoria is an outlier." *Id.* at \*5.

*Eighth*, Tiwari and Sapkota ask for a trial about the competing evidence, arguing that the record creates a triable issue of fact over the rationality of this law. We agree with one premise of this argument but not another. Under the circumstances of this case and of the Mississippi case, we agree with the district courts' initial decisions to reject the States' motions to dismiss. These cases both warranted discovery and the gathering of evidence and expert reports about the potential rationality of these laws. But it does not follow that, after discovery, a trial was in order. Summary judgment is an apt vehicle for resolving rational-basis claims. That's because the question is not whether a law in fact is rational. It's whether a legislator could plausibly think so. As to that modest inquiry, ample evidence supports the point—and a trial over whether the evidence shows that, at day's end, this or that legislator was in fact wrong is beside the point. Under rational-basis review, a law will survive constitutional scrutiny so long as the existence of a rational connection to its aim "is at least debatable." *W. & S. Life Ins.*, 451 U.S. at 674 (quotation omitted). Courts cannot subject legislative choices "to courtroom fact-finding," *Beach Commc'ns*, 508 U.S. at 315, and any factual dispute as to a law's rationality indeed "immunizes from constitutional attack the [legislative] judgment," *Vance*, 440 U.S. at 112. Because Tiwari and Sapkota's evidence does not push the rationality of this law beyond dispute, our Due Process Clause precedent dooms this claim "no matter what evidence they put in at the trial on the merits." *Chi. Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 745 (7th Cir. 1987).

*Equal Protection.* Tiwari and Sapkota also claim that the certificate-of-need law violates equal protection by irrationally exempting two entities—physician's offices and "continuing care retirement communities"—from its scope. *See* Ky. Rev. Stat. § 216B.020(1), (2)(a). What we have said so far goes a long way to rejecting this claim too. The Constitution, once again, "does not require" Kentucky "to draw the perfect line" or "even to draw a line superior to some other line it might have drawn." *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012). So long as the Commonwealth has not drawn categories "along suspect lines," its classifications will

survive scrutiny "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 680 (quotation omitted).

As for physician's offices, at least three explanations stand out for treating them separately: the modest supply of physicians in parts of Kentucky, the more urgent need for physicians than home healthcare agencies throughout the State, and the more heavily regulated nature of the requirements for becoming a physician. Ample rational bases exist for treating doctors' offices and home healthcare companies differently.

As for continuing care retirement communities, they are distinct in some of these ways and others too. They have a continuum of care depending on the needs of their residents. Ky. Rev. Stat. § 216B.015(11). True, these facilities sometimes provide services to their residents comparable to the services home healthcare companies provide. But the facilities serve only the residents that already live there, and they provide a vast array of services, both medical and nonmedical, that home healthcare companies do not. Moreover, these facilities do not receive Medicaid funding, meaning that the State does not subsidize this care in the same way it subsidizes home healthcare providers. Each distinction suffices to uphold the classifications.

The State could have "drawn [the line] differently" no doubt and perhaps should have. *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). But that consideration is one for the legislature, not the judiciary, to make. *Id.* The State need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970).

*Privileges or Immunities.* Tiwari and Sapkota raise a claim under the Privileges or Immunities Clause of the Fourteenth Amendment. But they concede that this claim is foreclosed by the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872).

\*\*\*

While this opinion rejects the claims of Tiwari and Sapkota today, that is not necessarily the end of the road. Not only do they have the recourse of further review in the federal courts, but it is well to remember that state-law options remain available to them. They may file another

certificate-of-need application. And if the State denies it, they may seek review in state court based on the procedural and substantive guarantees of state administrative law. As shown, Kentucky law does not countenance "arbitrary" decisions by state agencies, a standard that may be more toothsome than rational-basis review. The second option is the State Constitution. In the context of rational-basis review, it has happened before that the U.S. Supreme Court has denied relief under federal law with respect to an economic right, *see Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110 (2003), only to see the state courts grant relief for the same claim under the State's Constitution, *see Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 3 (Iowa 2004). While judicial modesty often carries the day in a forum for 51 jurisdictions and 330 million people, *Beach Commc'ns*, 508 U.S. at 314, that is not always the case under state law in state court for one State.

We affirm.