RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

RYAN CLAYTON WILLIAMS; TRACIE HANNAH; CHERYL
ROBINSON,

                       *Plaintiffs-Appellants*,

    *v.*

CITY OF DETROIT, MICHIGAN,

                       *Defendant-Appellee*.

> No. 22-1344

─────────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-12600—Terrence George Berg, District Judge.

Decided and Filed:  December 2, 2022

Before:  SUTTON, Chief Judge; COLE and GRIFFIN, Circuit Judges.

─────────────────────

**COUNSEL**

**ON BRIEF:**  Ryan Clayton Williams, RYAN CLAYTON WILLIAMS & ASSOCIATES LAW, Detroit, Michigan, in propria persona and for the other Appellants.  Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellee.

─────────────────────

**OPINION**

─────────────────────

SUTTON, Chief Judge.  The City of Detroit prohibits street vendors from selling their goods within 300 feet of sports arenas or stadiums.  After the completion of Little Caesar's Arena in 2017, the new home of the Red Wings and Pistons, Detroit refused to renew three vendor licenses for locations that fell within the 300-foot exclusion zone.  The displaced vendors sued, insisting that the City's actions violated their rights under the U.S. Constitution's Due Process Clause.  The district court granted summary judgment to Detroit.  We affirm.

I.

Since 2017, the Red Wings and Pistons have played home games at Little Caesar's Arena in Detroit.  On game days, thousands of fans traverse the sidewalks to and from the Arena.  An alert fan, or at least a hungry fan, might notice that street vendors do not operate within 300 feet of the Arena—or any other sports stadium in Detroit.

That is by design.  Like many cities, Detroit regulates street vending, particularly stationary vendors with carts or stands.  Detroit Code § 34-1-1.  The City determines what vendors may sell, how they may sell their goods, and, most relevant for today, where vendors may sell those goods.  *Id.* §§ 34-1-8, 34-1-9, 34-1-11, 34-1-12.  Vendors may not sell products on median strips, on sidewalks narrower than twelve feet, or to drivers and passengers of cars at stop lights.  *Id.* §§ 34-1-10, 34-1-5(k).  If vendors sell food, they must do so within 300 feet of "an approved and readily available" restroom.  *Id.* § 34-1-14(g).  Vendors may not be located within 200 feet of a school or 300 feet of a sports arena or stadium absent written approval by the arena or stadium.  *Id.* § 34-1-9.  The City may exclude vendors from other areas if street vending would lead to traffic congestion, dangers to public safety, or harms to surrounding businesses or properties.  *Id.* § 34-1-5(t)–(u).

Vendors also must have a license to sell their goods.  *Id.* § 34-1-21.  An applicant must pay a fee, describe the goods he intends to sell, and identify "the specific location" where he wants to operate.  *Id.* §§ 34-1-23, 34-1-22(a)(8).  Requests are limited to "approved location[s]." *Id.* § 34-1-34(e); *see also id.* §§ 34-1-4, 34-1-5(g).  If granted, a license lasts for a year.  *Id.* § 34-1-34(a).  To continue operating for the next year, a vendor must submit a new application and fee.  *Id.* §§ 34-1-34(c), 34-1-23(d).  The City "may deny a new or renewal application" for numerous reasons, *id.* § 28-1-16, and it may suspend a license if the vendor presents a threat to public safety or violates a rule, *id.* § 34-1-35.

Ryan Williams, Tracie Hannah, and Cheryl Robinson know all of this through first-hand experiences.  They have operated as street vendors in Detroit since 2008.  For most of that time, they peddled their goods and wares from the same locations near downtown.  That changed in 2015 when construction of Little Caesar's Arena shut down the area for nearly three years.  What

started as a brief change became a continuous one.  When the Arena opened in September of 2017, Detroit refused to issue licenses to Williams, Hannah, or Robinson in their accustomed places because they were all within 300 feet of the Arena.  Detroit applied the same standard to other vendors.

While their prior locations in the same downtown area made them competitors of sorts, they united in opposing the City's licensing regime.  Together, the three vendors sued Detroit, claiming that the City violated their due process and equal protection rights by refusing to renew their licenses for their former locations.  The district court granted summary judgment to Detroit. The trio of vendors appeals, focusing their argument on the claim that Detroit irrationally deprived them of a property interest protected under the Fourteenth Amendment's Due Process Clause.

II.

No State, the Fourteenth Amendment says, shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Under the guarantee, some form of process, sometimes elemental, sometimes formal, must precede any governmental deprivation of a person's property.  That much is plain.  But there is more to it than that.  No matter the extent of the process a State provides, a State also may not deprive a person of property if the substance of its decision is arbitrary or irrational.  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *Johnson v. City of Saginaw*, 980 F.3d 497, 513 (6th Cir. 2020).  To lodge this distinct claim, the one the vendors raise here, a plaintiff must establish (1) that it has a constitutionally protected property interest and (2) that the State arbitrarily or irrationally undercut that interest.  *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012).

A.

*Property interest.*  There is no such thing as "property" without law.  The law that usually creates the property protected by due process is state law, not federal law.  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  The U.S. Constitution does not create property interests. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  To warrant protection, the state law must create a legitimate entitlement to a benefit or a justifiable expectation of receiving it.  *Id.*; *EJS*

*Props.*, 698 F.3d at 856–57.  A State's decision to offer benefits or licenses does not create a property interest "if government officials may grant or deny it in their discretion." *Gonzales*, 545 U.S. at 756.

The Detroit Code does not create a property interest in a vendor's license.  The Code never says that applicants will receive licenses for the places they choose.  It instead requires that they apply "for an approved location," Detroit Code § 34-1-34(e), and warns that the City may "terminate[] or eliminate[]" a vendor location, *id.* § 34-1-34(f); *see also id.* § 34-1-5(t)–(u).  At no point does the Code offer any assurances, much less a guarantee, that applicants will receive a license.  The City, to the contrary, retains discretion to deny or suspend licenses to prevent a violation of the rules or to protect public safety.  *Id.* § 34-1-35.  "The law is clear that a party cannot have a property interest in a discretionary benefit." *EJS Props.*, 698 F.3d at 857.

On this legislative record, the three vendors lack a cognizable path to victory.  Detroit did not have any obligation to renew the three licenses, even if the vendors had met the minimum requirements.  That discretion by itself suffices to defeat the claims.  *See Gonzales*, 545 U.S. at 756.  More than that, more to the most conspicuous flaw in their claim, the three vendors did not meet the City's requirements anyway.  The proposed locations for each license fell within 300 feet of the Arena. Without consent from the Arena—consent the vendors here do not claim they have—the Code makes that unlawful.  Detroit Code § 34-1-9(b).  Because such a license would violate the City's Code, the three vendors did not have a legitimate entitlement to it.  Any other assumption about the license has its source in the vendors' internal expectations, not the realities of state law.  To be legitimate, a property interest must be grounded in objective state law, not the unilateral expectations of the individual. *See Roth*, 408 U.S. at 577.

The three vendors counter that they successfully renewed the license for several years and had every reason to expect the City to renew it again.  But renewals in the past do not justify expectations of renewal in the future—or, as we have put it, getting a license before does not justify "assuming that [the license] would be issued again." *Triomphe Invs. v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995).  Detroit required that the vendors submit a new application every year, and each application gave Detroit renewed discretion to reject their

request—in this instance because they sought a license for a forbidden location. *See* Detroit Code § 34-1-34(c).

Does it not matter, the vendors push back, that they held a license for the same location for many years? Not in the way they hope. The reality that a vendor grows accustomed to one spot does not give him a special entitlement to that location, change the City's discretion when it reviews his request, or alter the City's right to enforce its ordinances. The vendors must submit a new application every year, and each time it must be "for an approved location." *Id.* § 34-1-34(e). With the building of the new Arena, the vendors' prior locations no longer counted as approved locations. Having "made no promises of approval," the City did not create a property interest in a vendor's license at a particular location. *Triomphe Invs.*, 49 F.3d at 203.

The vendors' history of obtaining licenses, for what it's worth, is worth something. When the City eliminates a vending location, a displaced vendor receives "first preference" for other available spots. Detroit Code § 34-1-34(f). That offer is not an empty one. Robinson and Hannah applied for and received licenses for other locations.

B.

*Arbitrary or irrational.* The absence of a protected property interest is not the only impediment to this claim. Even a protected property interest would not suffice to defeat the City's licensing decision. To prevail, the vendors must also show that Detroit acted irrationally. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992). That showing is a demanding one. Not only must a State or locality act without a legitimate reason, but it also must act without a *conceivable* one. *Williamson v. Lee Optical*, 348 U.S. 483, 487–88 (1955); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). Federal courts tread lightly in reviewing such claims because we presume that States and municipalities weigh competing interests with reason, local expertise, and ballot-box accountability. *See Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992); *Tiwari v. Friedlander*, 26 F.4th 355, 361–62 (6th Cir. 2022).

Detroit had a rational reason for denying these vendor applications. Start with Detroit's interest in preventing congestion on its sidewalks. On game days, a Red Wings or Pistons game

may draw as many as 20,000 fans to the sidewalks surrounding the Arena. The sidewalks within 300 feet of the Arena "are particularly prone to congestion" because they are narrow: only six-to-eight feet wide in many places. R.28-2 at 6. Adding stationary vendors with carts to the mix could turn these sidewalks into corked bottlenecks. Seeking to avoid this congestion is rational, as is denying a vendor's license for the same sidewalks.

Detroit offers other explanations for this approach, such as ensuring sidewalk safety, eliminating blight and litter, and protecting arena operators from competition. While these too may be adequate, the rationality of preventing congestion makes them needless add-ons.

The three vendors claim that one of these alternatives—protecting the vendors within the Arena from competition by vendors near the Arena—is illegitimate. Even if we grant the premise, it does not alter Detroit's other legitimate reasons for creating and enforcing the 300-foot restriction. *See Tiwari*, 26 F.4th at 368. It remains the case that preventing congested sidewalks is a legitimate goal. And it remains the case that a 300-foot buffer zone around arenas is a rational way to advance it.

The vendors' case citations do not alter this conclusion. Two of them say only that States tread on Congress's turf when they burden interstate commerce to favor in-state interests. *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 526, 531–32 (1949). But the vendors have not brought a dormant commerce clause claim. The third case says that a State may not impair a private contract unless it does so for a public purpose. *See Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983). But the vendors do not claim that the City impaired any existing contract when it denied their license applications.

The vendors add that banning all stationary vending within 300 feet of every sports arena is arbitrary because it is not tailored to local traffic or geography. In some settings, they continue, ten feet may be adequate; in others, a thousand feet would be necessary. Perhaps so. But adopting a general rule over a particularized one is not irrational. Governments by necessity must regulate in some areas with general rules, in some areas with more refined rules, and in still more areas with general or specific rules that come with dispensations. So long as each rule and

dispensation has a conceivable explanation that is rational and that does not violate other guarantees of the U.S. Constitution, that is the end of the matter in this area.  The Constitution does not compel "mathematical exactitude" in local licensing regimes.  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  "It is enough that" congestion outside of sports arenas is "an evil at hand for correction, and that it might be thought that" a 300-foot exclusion zone is "a rational way to correct it."  *Lee Optical*, 348 U.S. at 488.

We affirm.